Can it please the Court, Ralph Hurwitz on behalf of Haji Jawara. There are a number of issues to present to the Court this afternoon. I'll outline them briefly, and then unless the Court has one or more questions regarding particular issues, I'll address them in the order that I recite them. The first is that the two counts with which Mr. Jawara was charged should not have been joined. First of all, under Rule 8, the charges were improperly joined. Second of all, under Rule 14, Mr. Jawara suffered prejudice as a result of the improper joinder. The second issue is with regard to certain aspects of the testimony of Agent Smalley. There are certain aspects of that testimony which should have been excluded either based on hearsay or based on relevance, and Mr. Jawara suffered prejudice as a result of the admission into evidence of those aspects of the document. Thirdly, there were two documents that were from the West African Education Council which were improperly admitted, both as a result of hearsay and improper authentication. And finally, the testimony of Carolyn Baer-Broering should have been excluded or at least subject to a Daubert hearing. I'll be You have a lot of issues. I do. I might as well ask you the ones I have questions about, okay? That's why I outlined them. Yeah, I appreciate that. Are you going to start with the first one? Well, I'll start wherever the Court would like me to start. Wherever you want to start. But I have specific questions about the agent's testimony. All right. Let's start there. So on the agent's testimony, my real question is, if it was an error to admit that because of, like, the evidence about the tribe and then comparative country conditions. He had kind of a whole spiel that he testified to. In light of the evidence, could you address the prejudice issue with respect to the agent's testimony? Certainly. And there were three specific issues that came up in Agent Smalley's testimony. The first is with regard to the significance of the Maraca tribe membership. That was a statement that was contained on the asylum application submitted by Mr. Jawara in December of year 2000. Agent Smalley testified that the Maraca tribe was found in certain countries, but among them was not Sierra Leone. The inference there is that if he's from the Maraca tribe and the Maraca tribe is not from Sierra Leone, then he can't be from Sierra Leone. The thrust of the government's case is that on the immigration fraud with regard to the documents, was that Mr. Jawara was in fact a resident of the Gambia rather than Sierra Leone, and that if he attempted to gain asylum and state that he was from the Gambia, in all likelihood, according to the government, that application would have been denied. On the other hand, according to the government, Mr. Jawara's likelihood of success on the asylum application would have been enhanced if, in fact, he were from Sierra Leone because of the civil unrest that had been in that country for a period of time. The prejudice is just that. If the, as a result of the hearsay regarding the, where the Maraca tribe was to be found, Mr. Jawara, as a result of his membership in the Maraca tribe, would have, in the mind of the jury, been prejudiced because, as a result of that hearsay, they would find that he was less likely to be Sierra Leonean. With regard to the conditions that were, as between the Gambia and Sierra Leone, what that essentially does, Your Honor, is to supply the jury with motive. In other words, why would someone want to make a misstatement on an asylum application and say that he was from Sierra Leone rather than from the Gambia? The conditions indicating that a Sierra Leonean would get more favorable action on an asylum application would be that motive. And therein lies the prejudice. Let me focus on the other part of what's the prejudice, which is what was the other state of the evidence? So let's go back to the first point. You just indicated that this would strengthen the government's case or would tend to show that he was from, was not from Sierra Leone, but was from the Gambia. Okay, if this evidence isn't there, what's the state of evidence from other sources, other evidence that was admitted into trial? If the answer to that question turns out to be there was all sorts of other evidence that demonstrated he was from the Gambia, you still have the remaining part of the question, what's the prejudice from this? Isn't this simply harmless error? So as you identify the issues, I'd like you to go on to identify why it is you think that the remaining evidence wasn't sufficient to establish to the points the government was trying to make. In terms of the motive evidence, I don't know that there was any other motive evidence. In other words, in terms of a jury saying what difference would it make whether he's from the Gambia or from Sierra Leone? I think absent that specific testimony from Agent Smalley, I don't think the jury would have an inkling as to why a person would want to suggest that he is from Sierra Leone rather than from the Gambia. And I'm sure that if I'm incorrect in that recollection, you'll hear so from Mr. Lang. With regard to the significance of the tribal affiliation, there was other evidence at trial, admittedly, that the government offered to establish that Mr. Juara was, in fact, from the Gambia rather than from Sierra Leone. And so the but-for test, I think, would not work strictly on the tribal affiliation evidence as it would with motive evidence. The final aspect of Agent Smalley's testimony is with regard to the number of asylum applications relatively between the Gambia and Sierra Leone. The inference that the government hoped for there was that if there are a greater number of asylum applications, that a significant number of those are likely to be fraudulent applications. There was absolutely no evidence to support this particular conclusion. Did the government argue that point? In closing argument, did it make that point? Because, frankly, I had trouble figuring out what this could relate to. Well, I was trying to figure that out myself at trial, Your Honor, and that was the only inference that I could figure out. In other words — But did the government overtly argue that inference anyplace? Don't talk. So even if it we said is not relevant, which you were scratching your head about, is it relevant, is there any prejudice from that if it doesn't have any kind of hat to hang on in the trial? Well, I would suggest that even if it was not specifically argued by the government at trial, Your Honor, it's something, an inference that certainly could occur to the jury. And if not, quite frankly, I can't imagine how Judge Robart could have deemed that it was relevant. I'll now address the severance issue unless the Court would prefer that I would address one of the other issues. With regard to severance, we have both considerations under Rule 8 and under Rule 14. Rule 8 is the rule that precludes the improper joinder of counts. And the three aspects of that rule which are not present here are either offenses which are of the same or similar character, offenses which involve the same act or transaction, and offenses which are part of a common scheme or plan. And with regard to the analysis under Rule 8, we look to the allegations in the indictment. We're not talking about an analysis that involves a showing of prejudice here. If we look at the indictment with regard to the count involving the fraud with regard to immigration documents, Count 5, that is an offense which, if committed, would have been completed in December of year 2000. Count 6, the conspiracy to commit marriage fraud, is an offense which would have been according to the overt acts in the indictment in year 2004. The acts are really not of the same or similar character. If you look at the terms of the indictment as to the conspiracy to commit marriage fraud, the manner of means, manner and means of the conspiracy are that Mr. Juara acted as a facilitator in terms of trying to arrange marriages for other aliens so that they could procure spouses for those other aliens. Clearly, with regard to the immigration documents, Mr. Juara was acting on his own behalf. I anticipate that Mr. Lang will say yes, but we have a conversation on November 13, 2004, where Mr. Juara was talking with the informant who's later identified as Peter Coleman. And in that conversation, Mr. Juara said, gee, maybe I should find a woman for myself. Not to say there at all that that necessarily implies a fraudulent marriage. And in addition, we know that one cannot conspire with a government informant, which Mr. Coleman plainly was. I would suggest that the consideration of that conversation as to Count 6 is inappropriate for that reason. The analysis also involves one that's akin to that used in Evidence Rule 404B. In other words, would the evidence of one offense be admissible in trial on the other offense? In this case, I would suggest that that would not be the case. The proof of the elements of the fraud with regard to immigration documents essentially is that there were certain statements in the asylum application of Mr. Juara which were materially untrue. And in fact, the specific statements are set forth in the indictment. With regard to the conspiracy to commit marriage fraud, there is absolutely nothing that would affect the proof if those statements were materially untrue. The government in its brief has suggested that there is an evidentiary overlap by saying, oh, but there are two witnesses, Mr. Giobarta and Mr. Coleman. Who would each testify as to both counts. I would suggest that a witness testifying as to both counts is not an evidentiary overlap. The subject matter as to which each of those two witnesses would testify as to each count is very different. Mr. Giobarta, for example, testified primarily with regard to facts pertaining to the fraud with regard to immigration documents. Let me ask you, if you could, to focus, you're making a relevant point, but you're also using most of your time, and I think you need to focus as well on the prejudice element here. What's the impact? Okay. Well, I'd note that with regard to Rule 8a, prejudice need not be shown. I don't think that's the case. So I'll give you fair warning of that. Let's assume there is prejudice required. Well, the prejudice, Your Honor, is this, is that, and I'm sure all of you tried many cases before going on the bench. This is a case where there were two very different themes going on at trial. They weren't inconsistent defenses in the sense that one required the proof of A and the other required the proof of not A. It wasn't like that. It was more that the themes in the two defenses were very different. On one, with regard to the fraud, with regard to the immigration documents, the defense argued that the asylum application was prepared by another individual for Mr. Giowara, and he simply signed it without reading it. With regard to the conspiracy to commit immigration, excuse me, conspiracy to commit marriage fraud, it was an affirmative defense of entrapment that Mr. Coleman essentially drew Mr. Giowara in. Now, those don't present an A and not A situation. But as a trial lawyer, I found it difficult to combine both of those into one cohesive trial argument. I remember as I was preparing the case for trial, it's as though I was serving a dinner to guests, and I was going to have two main courses, and one of them had to be sole muneer, and the other one was a jambalaya with boudin sausage and cayenne pepper. You know, yes, you can serve them both at the same time on the same table, but even if I told the dinner guests before and after the meal that in telling me whether or not you liked or in assessing whether you liked each dish, pretend that you were eating each one separately and not that you were eating them together. And you can tell me that a dinner guest is presumed to follow the dictates of the chef and would render an opinion on the meal in that way. Well, taking your analogy, it seems to me if the guest got a stomachache, that that would be prejudice. So the question is, what was Mr. Giowara's stomachache here? Well, I wouldn't say a prejudice is what's necessary, Your Honor. I would suggest that if the dinner guest's palate gets sufficiently muddied so that they say, you know, I can't really tell you what that sole muneer tasted like. But is that a different way of saying you don't think they can distinguish between the two charges or that there's cross prejudice? You see, I'm having a little trouble. What I'm saying is that the prejudice was that the advocacy became difficult. The what? Advocacy from me became difficult. Well, not about you. You're not the problem. What about a juror? Do you think a juror who was presented with a simple case of someone falsifying his asylum document would be influenced by the fact that he heard what he otherwise would not have, that he engaged in another fraud, unrelated fraud involving marriage for other people? Do you think that would have an impact on the jury hearing that otherwise would just hear the first count? I do. Well, isn't that more important than the jambalaya or how? Significantly. But I was just reaching for an analogy, Your Honor. Well, don't reach for an analogy. Just explain to us. I'm sitting in that jury box, Your Honor. I am reacting to the evidence. And I am thinking that, you know, if this guy is not playing by the immigration rules over here, maybe he's not going to play by the immigration rules over there. And I'm greatly concerned by that. And would you think, on the other hand, if the man said he was entrapped, that it's far less likely he's entrapped if you heard that he was engaged in another immigration fraud? I do. And that's why I was concerned about whether the defense would get a full hearing if the charges were combined in the same trial. Well, does it matter in the marriage fraud situation what country he's from? Does it or doesn't it matter there? It does not. It does not. I noticed that I'm In that trial, would he have to testify what country he's from as an immigrant? In which? In the marriage fraud trial. No, he would not. You don't think they could ask him, where are you from? And he'd say, it's not relevant? Well, given that the government alleged that he was a facilitator, I would say it would not be relevant. Only a minute and 45 seconds. You want to save your time for rebuttal? I'd like to save a little bit for rebuttal, if I may. Thank you so much. Good afternoon, and may it please the Court. My name is Mike Lang, Assistant United States Attorney for this district. Along with Mr. Hurwitz, I tried this case on the government side. The issues in this case relate to whether the trial court abused its discretion in deciding that certain evidence was reliable enough to be at this point. Well, we first start with whether the indictment was correct to join the two counts. And that's not a question of discretion. That's a question of law, and it's reviewed de novo. And I can address that initially if the Court would like me to do so, Your Honor. It seems to be what the – This was – apparently these two offenses are four years apart, although the indictment says you don't know when the second offense started, but the first overt act of which you're aware is four years after the asylum fraud. Yes, Your Honor. The – What's your best case on Joinder? The best case on Joinder, Your Honor, the best argument on Joinder, is the – is the fact that Mr. Coleman and Mr. Giobarta would have testified to both of the counts, to both of the incidents that Mr. – that Mr. Giobarta was involved in. In this particular case, I think – Well, suppose you had two totally unrelated counts, offenses that had nothing to do with each other, and the defendant's wife were going to be the witness in both counts. Could you join them? No. But the – in this case, I think it is the nature of the charges in conjunction with the overlapping evidence that makes them – So they're four years apart, and they're – they both are in the field of immigration. But one has to do with an individual lying on his asylum application, and the other is engaging in another type of fraud to help other people, facilitate other people's immigration crimes. When I concede that they are four years apart, I should probably clarify that, Your Honor, because in November of 2004, Mr. Giobarta, the defendant, was actually saying, I'm having trouble with my immigration papers, my – presumably his asylum application. He's asking Peter Coleman for help to – by means of getting a wife for him. Well, that's not what it – that's not – we're talking about the indictment. And the indictment doesn't charge that he wanted the marriage fraud for himself. The indictment says it was for others. Yes, Your Honor. And – The two offenses are, as I understand them, charged in the indictment, and that's what we look to for the severance, right, or the improper jointer. And the question, as I understand it, is, were these counts of a same or similar character? Yes. And if you view the indictment, you can – I would submit that you can see that they are of a same or similar character because they relate to immigration fraud or issues that relate to immigration fraud. And that is – that is, I think, what is the – one of the dominant concerns. I think that's the – that's the question. What does that term mean, same or similar character? And that's why I wondered whether there was a case – I mean, the case seemed the closest I saw that we had was Bronco. And that case doesn't really seem particularly relevant. They were talking about a counterfeiting offense where the individual counterfeited $3 million or so, and a month later they had him for possession of one of those bills. Now, that doesn't seem to be very close to four years of court with different unrelated offenses. And I, like the Court, have not been able to find a case that is – that would help us through this analysis. And therefore, I think it's useful simply to look at the facts of this case or the facts of the indictment and to determine, based on just a common-sense application of that phrase, are these crimes of a same or similar character? And I would submit that, in the government's view, they are. That asylum fraud and issues pertaining to asylum fraud would be of a similar character to issues pertaining to conspiring to assist people to remain in the United States unlawfully, that – to commit fraud related to immigration. They are – they are both of a piece. And I think when you – the concern, as I understand it, with improper joinder is – I would submit there are two concerns that I'm aware of, judicial economy and prejudice. And when you view these cases and look at any case that discusses improper joinder, they want to know, is this jury going to be prejudiced by hearing that some defendant shot somebody? I think that's right. Prejudice is the thing that concerns – or concerns me about this case or cases in general. Obviously, to some extent, it's always prejudicial for a jury to hear you did more than that you did less. And – but we allow that in certain cases. And it – there really isn't, I think, as you say, much to tell us about what it means when they're similar, whether it means the same – you know, they're both within the field of immigration, or are they different because in one case you're trying to get into the country and another you're engaged in a business or a practice of, you know, violating the law for other people. Is that the same kind of offense or not? Not much that tells us what it is. But as to prejudice, it seems to me – and tell me why it's wrong. It seems to me fairly simple, that it's extremely prejudicial on both of these, that he's in a much better position to defend the case if he doesn't have the two unrelated violations there together. If a man just comes in and says, you know, I'm charged with asylum fraud and I don't read the language – you know, in immigration cases you hear this frequently, I just signed the application, I didn't read it. Well, you might or might not succeed in that defense. But if you're told that he's been engaged in a regular practice of immigration fraud, that takes care of that defense, I didn't read it. And the same way on the other, if you are doing the – accused of facilitating the marriage fraud and you say, they trapped me into it, I wouldn't ever do anything like that. And then you're told, well, this is a guy who's here illegally to start with because he's engaged in fraudulent immigration practices. That certainly would affect the jury's view of that other one. So why isn't it clearly – maybe legitimately prejudicial, but if it's not legitimate, why isn't it prejudicial? And therein, I think, is the issue, Your Honor. I think every case – any case in which two or more counts are joined at trial is arguably prejudicial to a defendant because they have to respond and address and have the jury hear evidence of more than one crime that they committed. So the question is not whether it's prejudicial, but whether it's unlawfully prejudicial. And as I tried to break this case down, both at the trial level and as I reviewed this case on the appellate level, I was asking myself, if these cases were tried separately, number one, what is the strength of the government's evidence as to each charge? And I will take those now. As to the asylum fraud, the government's evidence was strong. We had an asylum application that had two patently bogus documents attached to it, a death certificate in which Mr. Giroir said, I would like asylum in this country, in the United States, and as proof of my country of origin, Sierra Leone, I'm offering a death certificate showing that I died in the year 1979. I think most juries that will look at that will say that is ridiculous. On top of that, he offered a Sierra Leone identity card, which in itself was offered as a legitimate government-issued identity card from the country of Sierra Leone, on which it asked for a thumbprint, T-H-U-M-P, thumbprint, instead of an actual correctly spelled thumbprint. So first of all, the two documents that he offered in support of his asylum application were patently bogus. But on top of that, we had expert testimony that showed in greater detail why they were bogus. On top of that, we had a man named Esa Jobarta who said, I know Haji Giroir. I went to high school with him in the Gambia. He's not from Sierra Leone. I actually knew him, and we were good friends for many years in the Gambia. And on top of that, we had school records showing that Mr. Giroir was from the Gambia. We had school transcripts from the very school that Esa Jobarta said he had attended with the defendant, and those school records showed Mohamed Giroir. They showed his grades. They showed the approximate time that he attended school as the same time that Mr. Jobarta was explained. So the asylum fraud claim was very strong in itself. Separating that from the conspiracy to commit immigration fraud with another individual, we have the defendant on tape in numerous taped transcripts which were submitted to the jury, the tapes and the transcripts, saying where the defendant is soliciting an undercover FBI cooperator, asking him to engage in immigration fraud. That in itself was strong evidence as well, when you have a defendant soliciting a crime on tape. So taking the two crimes separately and asking the jury to consider them separately, I would submit, it was easy for them to do and easy for them to decide these issues and these crimes separately. Now, the other question, then, is, if they were – if these cases – Mr. Stern, I understand this argument. It's – you're not really contesting the assertion by the defendant that there's some inconsistency in the defenses or some difficulty in asserting the two different defenses at the same time. You're basically saying the evidence is overwhelming on each of them, so the inconsistency isn't a problem. That is the – that is my main argument on this issue, Your Honor, yes. I also tried to determine if these cases were tried separately. Let's assume the trial judge said, I'm going to order these cases to be tried separately. The question I asked myself was, could I then present some of this evidence in an overlapping way? Would some of this evidence, as to either count, be admissible anyway, pursuant to 404B? And the answer that I reached was, yes, it could, particularly when we consider Peter Coleman. Let's assume that the asylum fraud case is taken and tried first and separately. I would call Peter Coleman as a witness. Peter Coleman is the person who was on tape, who wore the wire on the immigration fraud counts. Peter Coleman I would attend to call, if permitted, as a witness on the asylum fraud, because the defendant is claiming, I'm from Sierra Leone. Peter Coleman would come in and testify that I knew the defendant, I met him on numerous occasions, and he admitted to me, he's not from Sierra Leone, he's from The Gambia. And I would, as I think I would need to do, show some history and background of their relationship. Then I would submit that Peter Coleman, I would believe, would be permitted to testify and to introduce into evidence the recording where the defendant is saying, I'm having trouble with my immigration papers. And I would be permitted, I think, to have Peter Coleman and those tapes, that particular conversation admitted into evidence in a separate asylum fraud trial. The question then becomes, is entrapment an issue? Was entrapment raised in some way? And I don't know in a separate trial if it would be or not, but let's assume, because that's one of the arguments being suggested or that was suggested, then would we be able to introduce other evidence about past conversations between Peter Coleman and the defendant? I would like to think that I could to show that entrapment was not, in fact, a viable defense. And, therefore, I would submit that these prior recorded conversations where the defendant is engaged in seeking to commit immigration fraud, those, I believe, would be also admitted at the separate trial. So that is the analysis I went through as I tried to decide whether. Does it go the other way? If you had the. . . Immigration fraud trial. If you had the conspiracy trial separately, what would come from the. . . The. . . The asylum fraud. My belief is that the defendant's comments to Peter Coleman where he says, I need a woman for myself, can you help me for myself, that additional conversation would also be admissible at the conspiracy trial because it shows the nature and extent of their relationship. It is an additional recorded conversation between the cooperator and the defendant, and it would, therefore, I think, be admissible, cross-admissible at both trials. Is there. . . Do you have the strength of the evidence, the overlapping evidence? Is there anything else on prejudice, one way or the other? I'm sorry. I missed. . . Is there anything else on prejudice other than those two points that you rest on, other than the overlapping evidence and the strength of the case? No, Your Honor. And I would like to address some of the questions the Court had raised about Agent Smalley's testimony since that was raised on the defense presentation. And that, again, in essence, to summarize that testimony, Agent Smalley was attempting to answer a question related to motive. I think counsel is correct on that, that he was being asked, why would someone claim to be from Sierra Leone if, in fact, they were from the Gambia, and how in the world would that help their asylum process? And that was something that Agent Smalley was permitted to testify to as somebody experienced in these matters, experienced in asylum fraud investigations. And it's something that the jury would not necessarily know unless they had somebody of his background explain it to them. Unfortunately, I think many Americans aren't as familiar with the minutia of many countries around the world, the Gambia and Sierra Leone being two of them. And I think the jury would find it helpful to understand what are the conditions in these separate countries that would lead an individual to commit asylum fraud by claiming to be from Sierra Leone rather than the Gambia. Exactly. What is Agent Smalley's expertise, or how is his expertise defined here? His expertise was defined as being an immigration agent since 1988 that he had investigated, quoting in the record, several dozen cases of asylum fraud, that he processed approximately 18,000 refugee applications, and he attempted to explain that refugee applications and requests for being a refugee and asylum applications are very similar, but it just depends on what country the individual is in when they make that application. And he was required to investigate those 18,000-plus refugee applications. And so he explained that when he is determining or investigating a case of fraud and whether or not somebody is being truthful or being fraudulent, it helps as an investigator to understand what are the conditions in the country that they are seeking asylum or refugee status from. And so that is an area that he explores when he is investigating cases like this in his nearly 20 years. Let me express the concern I have. Basically, his expertise appears to be, I'm an expert in knowing when somebody has violated the statute or has committed immigration fraud. And it seems to me if you can offer up an expert with that broad, I guess, a mandate, you've got the door wide open to most any kind of hearsay or secondary source just by saying, well, this guy relies upon it. I mean, I can't entirely put my finger on what's bothering me here, but it seems to me this is a wide open door for anything to come in, whether or not he really knows about it or not. Well, I don't think that it's wide open insofar as that he could testify about countries that have nothing to do with this case. Isn't his area of expertise essentially the question that's being put to the jury? They're being asked, has this person committed immigration fraud? This guy is being offered up as an expert in immigration fraud. That seems to be an awful easy way to prove any kind of case. I'm an expert. I'm a police detective. I'm an expert in detecting robbery. And so you gather everything up, and he can use anything he wants to as an expert, and you can bring in anything that might otherwise not be admissible and offer it up through an expert because his expertise is exactly the criminal offense that's being identified and prosecuted. Well, something missing on that? In many cases, and I attempted to cite some of them, there are law enforcement officers are asked to talk about background and motive and other areas, gang insignia, for example. And how do those law enforcement officers know? I understand that. And I understand the delivery device. It's useful to have an organizer, and that's fine. But when they're talking about gang insignia, presumably they know something about the gang insignia. But Agent Smalley doesn't claim to know anything about Sierra Leone or the Gambia except for what he reads in the State Department report. I guess to draw out that, the gang insignia argument or just discussion for a moment, when I think about any officer that I know that knows, you know, when somebody holds up gang signs, how do they know what that is? Well, they know because they've asked gang members numerous times in the past, you know, what do those mean. They're basically repeating hearsay, arguably, because they've asked a number of people over enough period of time to explain them and now they know what they mean. Agent Smalley, based on his experience in investigating asylum claims, is asked now, you know, what do you look for when you are determining whether somebody committed asylum fraud or not? Well, I look for the country conditions in the country that they are claiming to be from and in the country that I believe that they are actually from. And those help me to determine if an asylum application is fraudulent or not. But why does that matter? Why is his determination of whether or not it's fraudulent matter? Because that's what the jury is supposed to be figuring out. Well, it matters because it provides, as counsel said, it helps the jury to understand a motive for somebody to do this. Otherwise, it makes – I think the jury would – it would make no sense to them to have an individual in front of them saying, well, I'm from Sierra Leone, the government saying he's from Sierra Leone – excuse me, he's from the Gambia, he's claiming to be from Sierra Leone. And the jury is going to say, well, why would he do – why would he do that? Why would he claim to be from one country when he's actually from another? Unless there's some underlying reason to do that, and that underlying reason is the conditions of the country that assist them to gain admission into this – into the United States. Your Honors, my time is almost up. I thank you for your attention. Unless there are specific questions, I will leave it to the Court's judgment. Thank you very much, counsel. May it please the Court. I realize I have just slightly over one and one-half minutes. I'd like to spend that time addressing the question of prejudice as to the Rule 14 consideration. Mr. Lange discussed what evidence he might have introduced as to the conspiracy to commit marriage fraud count, what evidence he might have introduced as to the fraud on the asylum application count. I would suggest that the proof as to each – the elements of each are quite separate. The thrust of the government's case on the conspiracy to commit marriage fraud count consisted of a number of recorded conversations, of meetings involving Mr. Jawara, Mr. Coleman, a gentleman named Ibrahim who was the person who was seeking the bride, and on one occasion, the woman herself. That – Mr. Coleman's testimony in that regard was basically the lay of foundation for those recordings as well as to explain the preliminary conversations he had with Mr. Jawara in that regard. The evidence that Mr. Coleman would have offered on the asylum fraud application was a conversation that he had long before that with Mr. Jawara, a simple statement attributed to Mr. Jawara that he was, in fact, from The Gambia. Even though Mr. Coleman would have arguably been a witness on both counts, the evidence he would offer on one, completely separate from the evidence he would offer on the other. Similarly, as to Mr. Jabarta, a thrust of his testimony was that he knew Mr. Jawara back in The Gambia. The only evidence that he would have offered arguably, if admissible at all, on the two counts, was that he met Mr. Jawara at a party, and Mr. Jawara suggested that the easiest way was to get married. Not to even suggest marriage fraud, so I'm wondering whether that would even be admissible. I assume my time is up, but I would suggest that the testimony that the government would offer on the two counts would be completely separate. Thank you very much for your time. Thank you, Chancellor. Case just argued will be submitted.
judges: Reinhardt, McKeown, Clifton